REDMANN, Chief Judge,
dissenting.
This is a hard case because the Louisiana second-degree murder statute is a hard law. It allows no other punishment than life imprisonment for a broad range of homicides, including:
Example 1. As revenge for some real or imagined wrong, one carefully plans to and does ambush another and with six shots from a pistol kills that other. Example 2. After chasing two persons on a motorcycle over a distance of two to three miles of city streets, with police siren blaring and lights flashing, through stop signs and lights, at speeds up to 95 miles an hour, a policeman (who may believe, in his excitement, but not reasonably, that he is being fired upon) shoots one shot at the motorcyclists when they are a car length and a half away, killing one of them.
Though society cannot tolerate either homicide, it is a hard law that treats the second the same as the first. A legislator might well vote to treat those two situations differently. Yet homicide is among the gravest of offenses, and defendant here — whose behavior is described in example 2 — does not argue that Louisiana’s constitutional prohibition of excessive punishment invalidates the statute's punishing his behavior with imprisonment for life.
This case was assigned to me for preparation of the court’s opinion, and I now reproduce as my dissent my proposed opinion, altered to show that is only my view rather than the court’s.
The basic question in this appeal is whether the state proved that the homicide *821 committed by defendant police officer was not justifiable, i.e., tracking the language of La.R.S. 14:2o,[1] that defendant did not reasonably believe that he was in imminent danger of receiving great bodily harm to save himself from which the killing was necessary. A second question is whether a new trial should have been granted because of the state’s failure to furnish defendant with a witness’s statement arguably supportive of defendant’s justification argument.
Defendant and another police officer were pursuing two persons on a motorcycle that was speeding up to 90 or 95 mph (according to its driver) over a distance of two or three miles on New Orleans streets shortly after midnight on August 31, 1983. Defendant shot and killed the passenger. Although defendant did not testify, a statement by him was introduced in which he describes a “pop” and flash from the motorcycle that convinced him he was being fired upon, and for that reason he “returned fire with one shot.”
The trial judge, sitting without a jury, found defendant guilty of second degree murder, “the killing of a human being ... [wjhen the offender has a specific intent to kill or to inflict great bodily harm ...,” La.R.S. 14:30.1, and imposed the statutory sentence of life in prison. Defendant appeals.
I
Defendant argues from State v. Edwards, 420 So.2d 663 (La.1982), that it is the burden of the state, once the defendant raises the justification defense, to prove that defendant did not reasonably believe that the persons on the motorcycle were shooting at him and his partner. Citing State v. Holmes, 388 So.2d 722 (La.1980), defendant argues that to infer specific intent the circumstances must exclude every reasonable hypothesis of innocence, and then, comparing specific intent to justification, urges that the state failed to exclude every reasonable hypothesis to prove beyond reasonable doubt (citing Edwards, supra) that defendant acted without justification.
Defendant does not contend that a trained police officer, shooting a .357 pistol at someone a car length and a half away, may not intend to inflict great bodily harm upon his target. (I have considered, nevertheless, the arguably inconsistent testimony by the state’s principal witness, defendant’s partner, that defendant first said “I missed” after shooting, but when the passenger fell, defendant said “Oh, fuck, I hit him!”) Defendant contends only that the state failed to carry its burden of proving, beyond reasonable doubt, the absence of justification.
To meet that burden, the state presented the testimony of defendant’s partner, testifying under a grant of immunity. He described the high-speed chase with flashing lights and siren, from start on Louisiana avenue through Toledano street and Washington avenue to fatal finish on the Palmetto street overpass. He denied any shot or backfire from the motorcycle (though he saw “both flashes” and defendant shot only once) or any other cause for fear of the motorcyclists when defendant announced “I’m going to shoot” and shot as the car was only a car length and a half from the motorcycle. The state also presented the testimony of the motorcycle driver denying both shooting and backfiring from the motorcycle, and the testimony of a neighbor that she had heard only one shot.
In turn, the defense presented testimony by two other neighbors that they had heard two shots. The defense also presented the testimony of a motorcycle expert (hired by the city’s administrative investigative agency in investigating this incident) that, when he tested the motorcycle on which the victim had been riding, it backfired as he drove at about 55 mph on the route that *822 the victim had taken just before he was shot by defendant. As the motorcycle reached a dip at the bottom of the overpass and bounced into the air and back down, the movement caused the expert’s thumb to accidentally hit the “kill” switch, turning off the engine: switching it back on caused the backfire. Every time the expert turned the switch off and on, backfire resulted; the faster the speed, the louder the backfire. At night, he testified, the backfire might be seen as a flash out of the tailpipe. (This expert’s testimony thus established the possibility that the motorcycle might have backfired, making a pop and a flash, and thus that defendant might have heard a pop and seen a flash at the time of the incident.) The defense also presented some evidence, by cross-examination of defendant’s partner, of the “chase syndrome,” suggesting “the excitement and confusion of the occasion,” Comment subd. (1), R.S. 14:20, that is a factor “in determining whether the party attacked had a reasonable belief that it was necessary to kill

The question for an appellate court on review is “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 309, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). There is no reasonable doubt that the elements of the crime itself — the killing and the specific intent to shoot the victim — were established by the evidence when viewed in the light most favorable to the prosecution. The heart of the case, on this assignment of error, is whether some rational trier of fact could have found the absence of justification.
I cannot say that no rational trier of fact could have concluded that justification was proven absent, and I therefore find no reversible error in this assignment.
II
Defendant’s second argument is that a new trial should have been ordered because of the state’s failure to furnish defendant a copy of the statement of reserve police officer William Scott Helfand in response to defendant’s request for material discoverable under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The trial judge’s “firm belief” was that the state should have furnished the statement. He observed, on the hearing of the motion for a new trial, that the statement “would have been critical to the defense’s case” in that defendant would have made a “concerted effort” to find that witness. The trial judge nevertheless denied a new trial.
Helfand’s statement included that defendant or his partner “yelled to me that the man on the ground had a gun” almost immediately after the shooting, when they “were just getting out of their car.” Hel-fand (with his girlfriend, Donna Oakleaf— also a possible witness, though her name was not disclosed to defendant) was on the scene of the end of the chase just as the shooting occurred. If one is of the trial judge’s view (“No time to concoct a story at that junction”), one might conclude that Helfand’s statement supports a factual conclusion that, rightly or wrongly, defendant believed that the victim had a gun. Helfand’s statement thus indirectly supports a conclusion that defendant believed he had been fired upon and thus supports defendant’s justification theory. The statement also provides some conflict with defendant’s partner’s trial-time statement that he and defendant had no cause to fear the motorcyclists.
Defendant by pre-trial discovery motion had sought “an accounting of any documents and tangible objects which ... are favorable to the defendant” and “any and all evidence, of whatever nature, that may be deemed exculpatory as to the defendant, no matter how tenuous the exculpation.” The state in response provided the city’s motorcycle expert’s report and the names of possibly exculpatory witnesses, namely that expert, the two witnesses who testified of hearing two shots, and Helfand. Defendant did not at any time request any *823 statement by Helfand. He argues that that was unnecessary, as he reasonably assumed from the state’s giving him the expert’s statement that the state had no statement from the other witnesses.
United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976), rules that when the defendant has made no request or only a non-specific request for exculpatory material, the prosecution’s duty to disclose exists only if “the omitted evidence creates a reasonable doubt that did not otherwise exist .... ”
I cannot say that Helfand’s statement creates such a doubt. Considering the case as a whole, including the cover-up action and statements by defendant and the partner hereafter alluded to, Helfand's statement that defendant or his partner said that the victim had a gun on alighting from their car means nothing except that they made up the gun story right away. It does not create a different reasonable doubt from, nor afford any greater support to doubt than, the other defense evidence already in the record.
Much less can I say that the Helfand statement (or further, similar testimony by Helfand, if he had been found and testified) “would probably have changed the verdict or judgment of guilty ...,” making new trial mandatory under C.Cr.P. 851.
I find no reversible error in this assignment.
Ill
Because of the public interest in this case, and because of their conceivable value to a reviewing court, I do note some additional circumstances that I deem not squarely relevant to guilt or innocence. Most prominent of all is that defendant and his partner “planted” a gun on Bamboo road, a possible escape route for the motorcycle and its driver (whom they did not pursue, defendant’s partner testified, because they knew he could contradict their gun story). They also broadcast on their police radio that they were being fired upon and thereafter gave similar statements to the investigating police and administrative agencies (all of which, the partner testified, was nothing but coverup). It may also be mentioned that the driver of the motorcycle had pled guilty in 1982 to carrying his mother’s .22 caliber handgun at a school. And it may be added that a smashed lead pellet, not a bullet from defendant’s gun, was found atop the overpass. None of these circumstances, however, demonstrates any error in the conviction and sentence.
I would affirm.

. "A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger ...